All right, please proceed. Thank you, Judge Bea, and may it please the Court. Peter Stris, on behalf of the appellant VidAngel. There are two key merits questions in this appeal. Number one, does the Family Movie Act authorize VidAngel's copying and streaming? And if so, number two, should the DMCA be interpreted to gut not only the Family Movie Act, but also other well-recognized exemptions to copyright infringement? I'm interested in your focus here. Do you agree that absent the Family Movie Act, there would be a violation of the DMCA here? No, no, no, absolutely not. We're not arguing, Your Honor, that the Family Movie Act is a defense to the DMCA claim. How about on the Copyright Act? In the absence of the Family Movie Act, it seems pretty clear that at least with respect to reproduction, there would be a copyright violation. There would be a 106-1 violation. We need the Family Movie Act as a defense. Our core position on 106-4 is that even if the Family Movie Act incorporates the transmit clause, we don't engage in a public performance, so we don't need the Family Movie Act. But if you think that there's a technical violation of the transmit clause, we actually think the Family Movie Act does the work, and the term private home viewing creates an exemption there. So we need to answer your question, Judge Hurwitz. We need the Family Movie Act only as a defense to the 106-1 claim. So let me turn to the Family Movie Act. Before you do, because I understood your argument to be slightly different. In the absence of the Family Movie Act, you've got these works that are encrypted, and you use what appears to be illegal software, but that's not the issue, to decrypt them. Isn't that exactly what the DMCA is about? Absolutely not. And let me hash out our position because I think this is a very important issue, and it goes well beyond filtering. So here's our position, Judge Hurwitz. The discs that we buy are protected by CSS. That's undisputed. Our position is we had permission to bypass CSS. Anyone who buys a disc, you can't watch the disc if you don't bypass CSS. So we don't circumvent without authority. And this is very important because my friend, Mr. Verrilli, is going to tell you that under the DMCA, we only have the right to decrypt under the terms that they set for decryption. Obviously, we don't have the right to rip, and therefore it's not without authority. We say that the proper interpretation of 1201A3A, which is the definition of access control circumvention, is that once the copyright owner gives us permission to decrypt, to access and watch the whole movie, there's no longer access control circumvention. So the Act provides no protection whatsoever to anybody who buys an authorized copy of a work? Certainly not. This was the careful ballot. It does provide protection, just not through access control circumvention. No, so we're talking about we have access controls on a work. You buy it legally, and then you bypass the access controls. Whether or not you call them use controls or access controls for my purposes for the moment doesn't matter. Call them TPMs. You're saying once you legally buy a copy of a work, the Act is no longer applicable to you? Well, no, I'm not, because under this Court's decision in Blizzard, which, you know, obviously I'm no fan of. I prefer the Federal Circuit's view, but it's binding law here. You could create an access control and permit no one to bypass it. So the software warden in Blizzard is a good example. So how did you obtain permission to bypass this access control? I think it's pretty straightforward. You don't buy a disc. You don't pay $20 for a disc unless you're going to have the right to watch it. And it's undisputed on this record that the only way you can – the way CSS works is the only way you can watch a disc is if you bypass it by putting it in a DVD player. And just to be clear that our position is not hyper-technical or even novel, this Court has adopted precisely the reading that we're urging of 1201a3a in a parallel context. In the Breca case and en banc in the Nosal case, we discussed these on page 35 of the blue brief. And it's really important. Let me tell you the language that this Court used so I could draw the parallel. This Court said when an employer authorizes an employee to use a company computer, subject to certain limitations, the employee remains authorized to use the computer, even if the employee violates those limitations. And here's why this is so important, Judge Hurwitz. Is that a DMCA case? No, no. I seem to recall it wasn't. Yeah, if it were a DMCA case, it would be a fortiori and we wouldn't be here. It would be on all fours. So why does it help us interpret it in DMCA? Well, I think it does because it uses the same language. The Computer Fraud and Abuse Act talks about whether there's access without authority. And the spirit of those cases is essential here because under the studio's interpretation, if we're wrong, I want to be clear about the impact of this, even outside of the filtering context, the studios can grant complete access. They can say you paid your money, you have the right to watch and see every minute of this disk, but restrict lawful uses that Congress clearly intended to permit. And we know this because in Section 1201B of the DMCA, use control circumvention is not prohibited. And I'll give you an example, space shifting. If my friend Mr. Verrilli's position is right, then if I as a consumer, let's take vidangel out of this, let's take the consumerism, the business aspect out of this. If I go and buy a DVD, Judge Hurwitz, and I want to rip it so that I can watch it on my iPad, I've committed a civil and arguably a criminal violation of the DMCA. And my friend Mr. Verrilli will tell you, well, that's what Congress intended, and they put a rulemaking exemption in. You can go to the Librarian of Congress every three years and say, hey, you know, we should carve out this category. And our answer to that is just because you have the right to use the elevator doesn't mean you have the right to use the stairs. We don't think that sensibly Congress intended to make that the only avenue. And it's very dangerous if our interpretation is rejected because the librarian, for example, has repeatedly rejected an exemption for space shifting. And the reason that the librarian has rejected it is because he has said it's unclear under the law whether that is a fair use. And that's ironic because it's clear to this court, as we explain on pages 27 to 28 of the blue brief, this court has described space shifting as a paradigmatic fair use. So do you think the fair use doctrine applies to the DMCA? I think it does, but it doesn't need to in order for us to win. In other words, the reason this court rejected an infringement nexus requirement in Blizzard is not because the policy reasons that the Federal Circuit put forth in Chamberlain weren't serious. The court understood they were serious. It's because it thought it was extra statutory. We offer something that's perfectly statutory. That's why I draw the analogy to BRCA and to NOZL. You can interpret 1201A3A, the definition of access control circumvention, in a narrow but sensible way that is faithful to the balance that Congress struck by putting use control circumvention in a separate provision of the statute and saying we're only going to prohibit trafficking. And it makes sense. It's clear why they would only prohibit trafficking because it's analogous to contributory. But if Congress just meant to prohibit trafficking, and I always hate to put myself in Congress's shoes, why wouldn't they just say it? They did. Well, they didn't. We have this complicated act that says you may not circumvent use controls, and it didn't just simply say, look, you can't traffic in copies of copyrighted works. Well, with respect, Your Honor, the reason Congress did what it did is because the fundamental purpose of access controls are to stop people who didn't pay for content from being able to see and watch it. Use controls are totally different. They're to stop people from copying, performing, doing a number of things that violate a copyright owner's rights. So they put the two things in different sections. And for use controls, they said we're only going to prohibit trafficking because we're going to look at particular software and see, is it primarily used by people who are stealing things, or is it primarily used by people who have legitimate uses, and then you wouldn't be liable for trafficking. I may have taken you off track because you started off with the Family Movie Act, and it is important. So I appreciate that, Justice Roberts. I think our position on the DMCA is clear enough that I want to bring this back to the Family Movie Act because at the end of the day, and I'm going to try and reserve a minute for rebuttal, I think the clearest path to reversal of this injunction is that there was an obvious abuse of discretion in finding that there was a likelihood of irreparable harm. And I think the reason that's going to be important is going to be implicated by my brief discussion of the Family Movie Act. So Congress amended the Copyright Act in 2005. It doesn't apply as a defense to the DMCA. I concede that. But it clearly applies to any 106 claim. And when Congress added the Family Movie Act to Section 110, it did it to ensure that families could skip over offensive content after they bought or rented a movie. I think everyone can agree on that. By its terms, here's something else that I think both sides would agree on. The Family Movie Act applies both to performances in a home and transmitted to, in other words, streamed to a home. I think we're all on the same page there. Here's why this is so important. The record is very clear, page 711 to 712, for example. The studios have never, not once, granted a streaming license that permits filtering. The record 722, filtering prohibition is a standard term in every studio streaming license. So what this means is our physical disc streaming business was developed, this has always been our position, to avoid that studio veto precisely as the FMA intended. At the end of the day, I don't think Mr. Verrilli will be able to explain how under their interpretation of the Family Movie Act, anyone can ever filter through streaming without the studio's permission. Their view is you have to license the stream first. Their position is that's fine, but we think it just runs square up against the point of the Family Movie Act. Well, that's it. I mean, again, I'm not sure we need to resort to legislative history given the language of the act, but it's rather clear that the Family Movie Act was passed to validate a very specific business model, the clear. So, Judge Hurwitz, I don't think. So, you know, the act doesn't become a red herring or completely useless. Almost all the legislative history was people coming in and saying we have this model and their current copyright laws prohibit it. And Senator Hatch saying we can fix that. What you do is now legal. The two responses, Judge Hurwitz, one, I disagree vehemently with the premise. And so let me start with that. The legislative history says the opposite of what you just described. Congressman Smith, who wrote and introduced the act, repeatedly said, I'll give you one. Well, I don't want to fight about the history because I think it goes both ways. But my point is that when you say otherwise the act is a nullity, that's plainly not true. There is one model that plainly works under the act no matter what the studios say. So it doesn't work for transmission. Right. It was added. But here's where I think we're having a disconnect. You could if you put legislative history aside, you could interpret the act as only immunizing 1062 derivative work claims. Basically, all it's protecting is the ability to skip. We think the legislative history makes clear that's wrong. And we think we're squarely right on the text. So let me walk through that. Walk through the text. Because my difficulty with the text is go through the text of the FMA. So on the 1061 exemption, I think the language is plain. I actually think this is the issue on which our position is strongest. I actually think the alternative position is extremely weak. What the text does, and it's on page 19 of the blue brief, is it exempts filtering, the making imperceptible. Here's the language. During a performance in or transmitted, and then some irrelevant language, from an authorized copy. So the central issue for me is whether the copy that you have, because you're not transmitting from the one that you actually bought from them. You're transmitting from a copy that you've ripped, I think is the language, and then put onto your own computers. So why is that from an authorized copy language not fatal to your claim? So I'm going to answer that, but I see that I have a minute, and I really did want to have at least some time for rebuttal. So I'm going to kind of answer it in an abbreviated fashion. Which is, if that were true, then you could never make an intermediate copy and filter. And if you look at the rest of the statute, Judge Hurwitz, it says, or any technology, and then I'm going to quote, if no fixed copy of the altered version of the motion picture is created, this is the most significant language for us. I'm going to ask Judge Beyer to give you a minute, because I want to use up the rest of your time. But there is a fixed copy that was made here, is there not? Not of the altered work. Of the original work. Of the original work. And this is essential to our argument. Because the way we read the statute, and I think it's plainly right, Judge Hurwitz, by prohibiting the filtering process to make a fixed copy of the altered work, that necessarily means that the statute contemplates that you could make a fixed copy of the original work if it enables filtering. And I'll go back to your example. If the Clearplay box, because it made the process go faster, made a copy of the movie when you put the disc in, but not the altered version, but the whole movie, and then streamed, not streamed, played from the copy on the hard drive, I don't think anyone would seriously say that that's a 106-1 violation that's not immunized by the Family Movie Act, because Congress didn't care about the technology and whether it made an intermediate copy, as long as it met the other conditions in the provision. So I would like to make sure that I reserve a little bit of time. I'll give you a couple of minutes to rebuttal. Good morning, and may it please the Court. I'm Don Verrilli for Disney, Fox, and Warner Brothers. The District Court put this injunction in place because it saw VidAngel for what it is. It's an unlicensed, on-demand streaming service that lacks any legal justification and is totally unfair to us and to licensed streaming services. Now, what I'd like to do this morning is first go to the DMCA points that my friend Mr. Streis has made, then address the Family Movie Act, and then I will take a minute on irreparable harm, which Mr. Streis said he wanted to address later on in rebuttal, and, of course, answer any other questions that this Court might have. Starting with the DMCA, I think first I want to make a point about text, then binding precedent from the circuit, and then common sense. Start with the text. 1201A1A of the DMCA says no person shall circumvent, unequivocal, no exceptions. Circumvent is a defined term. It's defined in 1201A3A, and what it says is circumvention is unscrambling a scrambled work, decrypting an encrypted work, or otherwise avoiding a technological measure without the authority of the copyright owner. Then if you look at the very next definition in 3B, it defines technological measures that control access to a work as measures that the copyright owner has authorized to gain access to the work. Mr. Streis's argument, I don't think he disputes any of that. I take it his argument is that you've authorized the lawful owner of a disk to make a copy of it. Right. I think the point, I think, of the text is that you cannot make that argument parse with that text. It cannot work because what the text does is authorize a particular means of gaining access, and that's through the technological measures that have been licensed to equipment manufacturers who make DVD players and the DVD drives in your computers, et cetera. That's what the plain terms of the statute say. You don't need to take my word for it. That's what a panel of this circuit held in the MDY case, and if one looks in particular at footnote 16, you will see that in footnote 16 of that decision, what the panel is doing is going back and forth and saying we need to decide which way to read this, and the right way to read it is that the only way you gain access lawfully under the DMCA is by using the means that the copyright owner has authorized for gaining access. And I know this is a little unusual, but I think this will be helpful. In that footnote, what this circuit said is we agree with the Second Circuit in Corley, and it cites to page 944 of the Corley opinion, and I'd like to read two sentences from page 944 of Corley. Talents argue that an individual who buys a DVD has the authority of the copyright owner to view the DVD and therefore is exempted from the DMCA pursuant to subsection A3A. That's the definitional provision I was talking about a minute ago. When the buyer circumvents an encryption technology in order to view the DVD on a competing platform. That's my friend's argument right there. The basic flaw in this argument is that it misreads A3A. That provision exempts from liability those who would decrypt an encrypted DVD with the authority of a copyright owner, not those who would view a DVD with the authority of a copyright owner. On page 944, the page that this circuit cited, it unambiguously refutes the exact construction that my friend on the other side is proposing here. Unambiguously. Now if I could just make the common sense point. Their view of this thing is that when you buy a DVD, you also buy the keys to decrypt the DVD. But that's just not right. When you buy a DVD, the people with the keys to encrypt the DVD are the technology companies who have been licensed to create the DVD players and DVD drives in your computer that allow it to be viewed in an authorized manner. The brief of the DVD Copy Control Association is a really helpful context for this. I just urged that brief on the court, that amicus brief, because it explains how this system works. But let me just use a common sense analogy. I'm house hunting. I go with my real estate agent who has a key to a house that's on the market. And she has the authority to use the key to let me in and go look at the inside of the house. That does not mean I can come back the next day with a crowbar and break into the back door of the house because I want to cook myself breakfast to check out the kitchen. It's the difference between authorized access and unauthorized access. And that's the whole structure of the statute. Could you encrypt the works in such a way that they couldn't be filtered? I don't believe so, Your Honor. I'm not asking technologically. I'm asking legally. In other words, is the upshot of your argument in the DMCA that because you can use the same TPM as an access control and a use control, you could also set it up in a way that it couldn't be filtered at all? I don't think that's necessarily the upshot of our argument. But I think the reality is that's not the case before you. And in the case before you, and I think maybe it makes sense at this point to shift over to the Family Movie Act because my friend has conceded that the Family Movie Act is no defense to the DMCA. I do think text binding circuit press and a common sense show you that they're wrong. Before you shift over to that, if district court's injunction is premised on two statutory violations, copyright and DMCA, would the scope of the injunction be any different if it was only premised on the DMCA? Well, I don't think it could be. I'm not sure that's being argued, but I'm asking in a backward way. If we agree with you on the DMCA, do we need to reach the copyright issues? I don't think you need to. I think they're quite clear, and I think a clear resolution in our favor would be of benefit to everyone. But here's the thing. With the injunction, it enjoins more ripping, more unauthorized reproduction, and unauthorized streaming. The problem, of course, from our perspective, is in addition to the problems that exist on an ongoing basis, they have hundreds and hundreds of our most valuable popular works on their server. That's why I'm asking this question, because it seems to me that some portions of the injunction wouldn't be there if we were just dealing with the DMCA violation. Oh, I disagree. I guess that's why I'm saying I disagree, Your Honor, because it was the DMCA violation that led to those unauthorized copies being on the server, and they're transmitting from those unauthorized copies. And so if you were to change the injunction, you would allow them to reap the fruits of their illegal violations of the DMCA. And that's why even if Your Honor doesn't agree with us on copyright, and I very much hope to persuade you that we're completely right about that, the injunction, if you were to drop those parts of the injunction out, they could reap the fruits of their illegal conduct. So I think unless they come up with some different system that doesn't violate the DMCA, that injunction's got to remain in place, and if they do come up with some different system, they can go talk to the district judge about modifying the injunction. I think that's the proper course here. Now, with respect to the Family Movie Act, they've conceded that they violate the reproduction right in the absence of the Family Movie Act. We heard that earlier this morning. So their whole case on the Family Movie Act comes down to whether they're transmitting from an authorized copy. It's a doubly unauthorized copy. It's unauthorized because it's obtained in violation of the DMCA. It's a ripped copy obtained in violation of the DMCA, and then they make another unauthorized copy, which they use as the master copy, and the record is clear, unequivocal. They transmit from that master copy. So it's doubly unauthorized here, and this is exactly what that language from an authorized copy was trying to get at. Remember what we quoted at page 34 of our brief, Senator Hatch, the sponsor of this legislation, that you cannot invoke the Family Movie Act to excuse conduct that would be a violation of the DMCA on the ground that you're violating the DMCA so that you can do what the Family Movie Act would otherwise authorize. That's exactly why that, with the authority from an authorized copy language, is in the Family Movie Act. They get at exactly what my friends on the other side are doing. So that's one very straightforward way to resolve this case and recognize that they're outside the Family Movie Act. Now, in addition, I think it's worthwhile to look at the plain terms of the Family Movie Act. What it immunizes from what would otherwise be infringement are two things. One, the making imperceptible of limited portions of a motion picture. Two, the creation and provision of technology that enables such making imperceptible. It doesn't authorize copying that is otherwise unauthorized, and it certainly doesn't authorize streaming that is otherwise unauthorized and public performances that are otherwise unauthorized. And if you think about it for a minute, it can't do that, because if it did that, it would affect a massive transfer of the economic value of the public performance right in a digital environment from the copyright owners who made the works and are entitled to that economic value to somebody who streams without a license. What they're essentially saying is, if we filter, we can stream without a license. And remember, you can filter anything. If you filter out the credits, you're coming within the terms of this provision. So basically they're saying, so long as somebody filters, they can just stream to their heart's content without a license. It can't possibly be that what Congress meant to do when it enacted this careful compromise statute that created space for filtering and continued to protect the basic interests of copyright owners, that it was trying to affect that kind of massive transfer of economic value. And yet that's the direct consequence of the position they're arguing here. It can't be right. Now they've said a couple of times that our position kills off filtering. That's just not right. It's not right with respect to the example, Judge Hurwitz, that you raised earlier about the particular kind of technology that existed at the time of the FMA. It's not right now. There's technology out there, and you have an amicus brief from the company, Clearplay, that uses the technology that applies filtering to a licensed stream. It connects up with Amazon or Google, whoever it is, who have actually done what they should have done and gotten a license for the public performance rights. Let me get back to the question I asked before on the DMCA. If it's your position that you can only filter from a licensed stream, can the terms of your license prohibit filtering? So I think that's a harder question, I think, that in a situation in which they claim that those terms exist. If you look at the contracts, they don't exist. The record will speak for itself on that. But if you were to face a case in which there was a contractual term like that and somebody filtered and claimed the FMA as an authorization, well, you can decide that case when it comes before you. I think that's a harder case than this one. This one is a very straightforward case. So neither of us know the answer to that question. I think it's a hard question. I think you'd have to look at the terms of the contract in particular. Answering that question in the abstract seems to me to be a very perilous proposition because it's going to really be fact-dependent. But that's not what you have before you hear. That is not what you have before you hear. You don't have somebody who's trying to filter a licensed stream. You have somebody who's claiming, I can engage in unlicensed streaming, unlicensed streaming and pay nothing for it because I'm engaged in filtering. It's clear that the Family Movie Act, no matter what you say in your license, allows filtering from an authorized copy as opposed to an authorized stream, does it not? I think so. I think it would depend a little bit. The only reason you hear a little hesitation in my voice is I think it might depend on the technology that was used to do it. But in general, yes. And back to the basic point. So I'm asking then why is it different than it's a stream? Well, because I think if you've got an authorized copy, then you probably have a – it's authorized. If you've made a copy, you'll have to have had a license. That's what it means to have an authorized copy. You've got a license to make the copy. And they don't have a license to make the copy. Not only do they not have a license, but they violated the DMCA to make the copy, so it's doubly unauthorized, as I said. But just one more point on the filtering and whose side we're on here. I think it speaks volumes that the filtering company out there that's trying to do this in a way that's consistent with the copyright laws and the DMCA clear play has filed an amicus brief on our side. I think that tells you all you need to know about whether we're trying to kill off filtering or not. Now, if I could spend a minute on the question of irreparable harm, because I know my friend wants to address it. He said he thought the clearest path to reversal here is that the finding of irreparable harm is an abuse of discretion. Well, I think he did correctly raise the standard of review, which is abuse of discretion. This is an equitable judgment that the district court made here about whether an injunction was warranted. And I want to make a specific point about the record on which the district court made the judgment. Why aren't legal damages adequate and severely? Well, because I think it's well recognized, Your Honor, that legal damages aren't adequate as compensation for goodwill, loss of goodwill, damage to business relationships with partners. I mean, basically the argument my friend's making as well, you could figure out what an appropriate license fee would be and just calculate damages that way. But all that would do would be to measure the level of damages caused by them not having gotten the license they should have. It wouldn't measure all of these other harms. Couldn't you get an expert witness to say, because of this, we've had all these damages? Well, you could, I suppose, but courts have routinely recognized, and we cite several cases on page 50 of our brief, Your Honor, that this kind of harm to goodwill, to relationships with business partners, et cetera, is difficult to quantify, and it routinely justifies the imposition of a preliminary injunction, routinely. Now, with respect to the finding of irreparable harm here, remember the question is not whether there is certain irreparable harm, but whether there's a likelihood. And the question is whether it's a likelihood of imminent irreparable harm. Now, my friend on the other side says, after eBay in winter, you can't presume harm. True. You'll see the district judge specifically cited those cases, specifically recognized you can't presume harm, said, I'm not presuming harm here. I'm finding harm on the basis of record evidence. And the record evidence that the district court cited is the declaration of Mr. Citadine, which says, and he's on the front lines of negotiating with people who get licenses to do what they do in an unlicensed way, said this kind of unlicensed activity, unlicensed streaming activity, damages us in multiple ways. It damages our goodwill. It damages our ability to negotiate effectively with people who are trying to do the right thing and get licenses because unlicensed services diminishes the value that a licensed service can get out of the streams. He makes these specific findings. Now, my friend says, well, he doesn't connect them up to the specific conduct of vidangel, but, you know, it's a little bit ironic that they would make that argument because if you go through the evidence, what you will find is that they repeatedly in their advertising brag about doing the very things that Mr. Citadine said harm the goodwill and relations with our legitimate streaming partners. And I can just give you a few citations to record evidence that will help, I think, clarify that there's no abuse of discretion here. First, I would point the court to supplemental excerpts of record SCR 1101 to 1106 where you will see vidangel advertising to the public that you can get access to movies on vidangel that aren't yet available on Netflix because they don't respect the exclusive windows that we negotiate with licensed partners. If you look at SCR 1119 to 1144, you'll see all kinds of evidence about their advertising $1 a day streaming, undercutting the prices of licensed streaming services. If you look at ER 560, you'll see advertising about the availability of a particular Star Wars film before it's available through any licensed service. If you look at ER 565, you'll see another example of that. And then finally, I think this, I hope, is the nail in the coffin for this argument about where the equities lie here. I think it's worth remembering that even after the district court imposed the preliminary injunction, vidangel kept operating its business. And it didn't just keep operating its business. It kept adding more titles, more of our titles, to their database even after the court had entered the preliminary injunction. I think that tells you where the equities lie here. And just to take a step back, what the district court saw here is that it had two choices. It could either let this thing continue to operate and grow and expand and have the violations continue to expand exponentially and have all of these consequences on a growing and growing basis, or it could put a stop to it. I don't think there's any doubt about where the equities properly lay in this case. Thank you. Thank you very much. We've taken over your time. We'll give you three minutes for rebuttal. Thank you, Judge Bea. Three very important points to contextualize this given that it's an appeal of an injunction because this is really important contextually. First, the core of Mr. Verrilli's argument is kind of an appeal to equity. Unlicensed streaming, it can't be allowed. You're only charging a dollar. You're getting it before other people. I would submit that that begs the critical questions here about copyright exhaustion. In other words, what rights do studios give up when they sell the movies in the first place? Those are complex. Those are doctrinal. They're not as obvious as you might think. Copyright owners made similar arguments against physical rental businesses years ago. They said, wait, how can you rent things at a cheap price when we're contractually telling people to rent them for a high price? It begs the question that needs to be litigated in this case. You said that even, I assume your equities argument is that even if there was a violation of these two acts, the court abused its discretion in granting a preliminary injunction. No, no, that's true, which I'm going to get to next. But if there was a violation, what difficulty I'm having with your equities argument, if there was a violation, then why did the district court abuse its discretion in balancing the equities? So I'm going to answer that, but I want to be clear about the last point I made, which is I think the wave of the hand this case is so easy is a little bit of a wave of the hand. The DMCA and the FMA arguments are much more complicated, I think, than you might give credit for. Now, here's the answer to your question. So the studios are continuing to boycott filtering. So we have substantial antitrust claims that are live in the district court. Here's why this matters. If we lose on either the copyright or the DMCA claim, but we prevail on those counterclaims, the studio's ultimate remedy might be a compulsory license. They might not get an injunction at all. So that's why it's very important to faithfully apply the likelihood of harm as an independent prong. Now, let me go to that. If you look at the district court's injunction here, it's almost identical to the order that this court reversed in Herb Reed, which is the lead case cited for the standard by the district court. It cites the right standard, but then it just parrots conclusory statements. And let me explain what I mean. Page 720 to 721 of the record, the only witness of the studios admits that no one ever complained about, let alone mentioned VidAngel. Page 156 of the record, the studio's trial lawyer admitted in response to a question from the judge, are there any declarations in here that anyone, iTunes, Amazon, someone's upset about VidAngel? No, we have no evidence. The reason that matters is the only thing that would be irreparable, the only thing that would be irreparable to the studios if you let VidAngel continue through the pendency of this litigation, is something like loss of goodwill. But it's their burden. It's their burden. And if they can't come forward with anyone complaining, let me tell you why that matters. The citadine declaration, and I encourage you to look at it, it's 554 to 567 of the record. The key paragraphs, these are the only ones that the district court cites, are paragraphs 18 to 22. They talk about how licensing partners complain about pirates, about people who don't pay for content. Here's the key, and I'm going to end with this. There's one thing that distinguishes VidAngel from everyone else. We buy thousands of discs, and we ensure that there's a one-to-one relationship in terms of how they're used. We're essentially a streaming version of Redbox. Here's why that matters, particularly in response to your question, Judge Hurwitz, about irreparable harm. That means that there's no reason to believe that if this lawsuit plays out over the next year or two years, that it's going to irreparably harm the relationship with licensing partners. Let me ask you one factual question. I know you've gone over your time. Is there really a one-to-one relationship? Redbox buys a disc and then rents it to somebody. Yes. You buy a disc, you copy it, and then you use that copy multiple times to do filtering. Let me be clear. There is a one-to-one relationship. We are the same as Redbox in that respect. I'll tell you how we're different. No, no, but I don't want a legal conclusion. I just want to make sure I'm right factually. Yes. You don't, every time you have a new subscriber, you don't buy a new disc and then filter it, correct? No. It comes from a master copy, but every time we have, let me just be clear, every time someone wants the content, there has to be a physical disc with a barcode that's associated with them that is sitting in our warehouse just as the equivalent of Redbox having that disc sitting in their machine. That's what I meant when I said one-to-one. I just wanted to understand your factual point. Thank you very much. Thank you. The case of Disney Enterprises et al. versus Vet Angel will be submitted.
judges: Bea, Hurwitz, Kobayashi